## No. 150.

### John Phelps & Co. *v.* Farmers' & Merchants' Bank, of Paris, Texas.

1. Bills of lading are representatives of the property described by them, or "symbolical" thereof, whereas a promissory note is an unqualified promise to pay a certain sum at a certain time.
2. A bill of lading, therefore, like the property it represents, may be transferred independent of the question of negotiability.

3. Bills of lading are *quasi-negotiable*, and hence transferrable without endorsement.

4. The law merchant is a part of the law of Louisiana; and it is such, as interpreted by the courts of other States, except where modified by our own statutes.

5. The Act of 1868, No. 150, p. 193, had for its object to sanction by statute transfers of bills of lading, to prevent frauds in connection therewith and to facilitate commercial transactions relating to bills of that character.

6. Neither the provisions of that statute, however, nor those of La. Revised Statutes, Section 2482, transform bills of lading, or other similar documents, into promissory notes or commercial bills of any kind.

7. A bill of lading is not placed by the Louisiana law upon the same footing as ordinary commercial paper; and the endorsement of such a bill does not bring into operation the general laws and usages which prevail as between endorsers and endorsees of promissory notes or bills of exchange.

8. Where a bill of lading, unendorsed, is attached to a draft as a security for the latter, and the draft is endorsed to another "for collection," such endorsement of the draft, accompanied by delivery of the bill of lading, empowers the endorsee of the draft to enforce the delivery of the property constituting the shipment.

9. The commercial laws or usages making commercial paper negotiable, and those which exclude equities between parties thereto, are not identical; and the mere extension of the laws and usages making commercial paper negotiable, by endorsement, to bills of lading or similar documents, does not extend to those last named, the rules and laws of commercial estoppel as between parties.

10. Where, as in this case, it is attempted to hold the one who collected the draft attached to a forged bill of lading, the latter being a security, as one who has received money from another who has paid in error, it is contradictory to contend also that the recipient is liable upon the bill of lading as an endorser or guarantor of the said bill of lading.

11. If the contract evidenced by the draft be null for fraud, error or deceit, the cause of action on the part of the injured one is solely against the fraudulent drawer, for the *bona fide* holder of such commercial paper is not to be affected by the frauds which led to the contract between the original parties.

12. In a case where one party draws upon another, annexing as a security a fraudulent or forged bill of lading, and negotiates the draft to an innocent third person, the purchaser of the draft is not held to know that the acceptance was solely upon the credit of the bill of lading.

13. The unqualified acceptance or payment by the drawee, in such a case, constitutes, against the drawee, a declaration of right in the drawer to put out the draft, and leaves him no right to object to the holder that he was negligent in the matter of accepting the bill of lading.

14. Where the bill of lading in such a case stipulates for the delivery of property to the order of the one who has negotiated and paid for the draft to which it is attached, and the holder of the draft and bill of lading places upon the latter the following inscription, "Pay to the State National Bank, N. O., or order, *for collection*"—held, this did not transfer title to the State National Bank, or authorize

it to endorse said bill of lading to anyone else in the name of or for the original negotiator of the draft.

15.  The authority conferred by such an inscription was simply to enforce the bill of lading at the port of delivery for the benefit of the owner, in case the draft annexed was not paid.

16.  Nor in such a case as this could the mere stamping on the back of the bill of lading, upon payment of the draft attached, of the words, "State National Bank, New Orleans, Paid," be considered in any event as an endorsement.

*Appeal from the Civil District Court, Parish of Orleans. Monroe, J.*

*Thos. J. Semmes & Payne* for plaintiffs.

*Jas. McConnell* for defendants and appellants.

Rogers, J.—McCuistion, Jr., drew a draft dated April 21, 1880, at Paris, Texas, on John Phelps & Co., in favor of the Farmers' and Merchants' Bank, payable at sight, for $750—and said draft was indorsed by said Bank. Attached to the draft was a bill of lading for nineteen bales of cotton, purporting to have been issued by the Texas and Pacific Railroad Company. The cotton was consigned in the bill of lading to the order of the Farmers' and Merchants' Bank, and the bill of lading was indorsed by said Bank, and forwarded, together with the draft, to their agent here, the State National Bank, who presented both the bill of exchange and the bill of lading at the office of John Phelps & Co., who paid the bill of exchange on the faith of the bill of lading so indorsed. Subsequently, it was discovered that no such bill of lading had been issued by the railroad company, and that the instrument purporting to be a good bill of lading was a forgery. John Phelps & Co. at once demanded that the amount paid by them, as they allege, on the faith of the bill of lading indorsed by said Bank, be refunded, which the State National Bank, as agent of the Farmers and Merchants' Bank, refused to do.

McCuiston was a correspondent of plaintiffs, and had had several transactions with them relative to the shipment of cotton and drawing of drafts. This appears from the following statement, which we find in the record:

*Statement of Drafts drawn by M. H. McCuiston, Jr., on and paid by John Phelps & Co.*

1880.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mch. 11. | To draft to Farmers' and Merchants' Bank against 41 bales cotton, with bill lading attached | | | | | | $2410 00 |
| do 13. | do 21 bales cotton, with bill lading attached | | | | | | 1212 03 |
| do 19. | do 38 | do | do | do | do | | 2100 00 |
| Apr. 22. | do 15 | do | do | do | do | | 700 00 |
| do 24. | do 19 | do | dc | do | do | | 750 00 |
| do 27. | do | order, | | | | | 200 00 |

E. & O. E. 134 bales cotton...........................$7372 48

New Orleans, Nov. 9, 1880.

The draft which is entered in the foregoing account on April 24, against 19 bales of cotton, for $750, is the one to which Mc-Cuiston attached the forged bill of lading. The draft was genuine, but the bill of lading was a forgery.

The Farmers' and Merchants' Bank in Paris, Texas, it is admitted, discounted the draft with the bill of lading annexed, in good faith, in the usual course of banking business, in the honest belief that it was genuine, and paid the full amount for the same, less the customary discount.

The letter written by McCuiston to the plaintiffs, advising them of this draft and shipment of 19 bales of cotton, reads as follows:

" Blossom Prairie, Texas, April, 1880.

" Messrs. John Phelps & Co., New Orleans:

" *Gentlemen*—I have to-day received acc't sales 61 bales sunk cotton, netting $3584.36. Have to-day sent you 19 B. C. of pretty cotton, all good, and drew a draft against it favor F. & M. Bank for $750. I also drew one favor Star Gales for $200. Will send more cotton Friday, enough at least to keep my margins ahead. Write me your views on the market. Have great confidence in your (Phelps') judgment or cotton sense.

" With kind regards,

" M. H. McCuiston, Jr.,

" Successor to McCuiston & Lambert."

That this letter was received there is no dispute; the record shows it was answered on April 29th.

The draft was in the usual form. The bill of lading attached to the draft was in these words:

"PARIS STATION, April 20, 1880.

Received from M. H. McCuiston, Jr., to be shipped to Shreveport, La.—19 B. C.            R. WARMS,

Marked               Agent Texas and Pacific Railway Co.

H. M.

Consigned to—order

Farmers' & Merchants' Bk.

    Notify John Phelps & Co.

       New Orleans, La.

19 B. C.

The indorsement was: "Pay State Nat'l Bank of N. O. or order, for collection on account of Farmers' & Merchants' Bank, Paris, Texas.         C. W. HERTZ, Cashier."

On the 24th of April, 1880, the State National Bank of New Orleans presented the draft, with bill lading attached, to John Phelps & Co., who paid it without objection.

The present suit was brought on the 4th of June, 1880, and then it is admitted McCuiston had absconded and now is utterly worthless.

Plaintiffs, in whose favor judgment was rendered in the lower court, say:

"On the trial, in the lower court, of the suit brought to recover the money thus paid by John Phelps & Co., the vital question was, what is the effect of an indorsement of a bill of lading, made negotiable by the laws of this State, as regards the liability of the indorser? Section 2485, Revised Statutes, declares 'that all bills of lading    *    *    shall be negotiable by indorsement in blank, or by special indorsement *in the same manner and to the same extent* as bills of exchange and promissory notes.' It is, therefore, contended that an indorsement of a bill of lading carries with it the liability attendant upon the indorsement of other negotiable instruments."

The defendants contend that the plaintiffs cannot compel them to refund the amount of the draft so paid, in view of the following legal considerations:

I. Commercial questions of this character, to-wit: whether a bill of lading is a negotiable instrument and the extent of the liability of an endorser thereof, is determined by the *lex mercatoria*, or law merchant, under which it is perfectly clear the defendants would not be liable as endorsers of this bill of lading. Shaw vs. Railroad Co., 11 Otto, 562 *et seq.;* Hoffman vs. Bank of Milwaukee, 12 Wall. 181 *et seq.;* 91 U. S. p. 94; 42 Eng. Common Law, 63 *et seq.;* 15 Penn. Stat. 238.

II. The principles of the *lex mercatoria or law merchant* prevail in Louisiana and Texas and every other State of the Union, unless modified specially by statute.

In 1 La. An. 325-326, Mr. Justice Slidell, in deciding the case of Bradford vs. Cooper, said: " It is a fact of which we deem it our duty to take judicial notice, that the *law merchant* prevails throughout the States of this Union, except so far as the same may be modified in particular States by statute." See also 4 La. An. 206, 210.

III. The only chance, therefore, for plaintiffs to recover in this suit is for them to show affirmatively a statute by which the principles of the law merchant have been so modified; and in considering such statute, all courts are governed by the following rule laid down by the Supreme Court of the United States:

" No statute is to be construed as altering the common law further than its words import: It is not to be construed as making any innovation upon the common law which it does not fairly express. Especially so great an innovation as would be placing bills of lading on the same footing in all respects with bills of exchange, not to be inferred from words that can be fully satisfied without it." 11 Otto, p. 565; 12 Wallace, p. 190.

IV. Section 2485 of the Revised Statutes of Louisiana is similar to like statutes passed on the same subject by the States of Missouri and Pennsylvania, which have been construed by the Supreme Court of the United States, and the interpretation so

given is applicable here, and must preclude the plaintiffs' recovery." See Shaw vs. Railroad Company, 11 Otto, 562-565; see also, 12 Wall. p. 190.

Two other points are made which we do not consider necessary to the determination of the case.

Plaintiffs-reply:

"If the authorities cited by defendants were the common law, the law of Louisiana would determine the question of liability at once. These authorities, however, though good law, are inapplicable to the case at issue, because in England and in many States in the United States, the law merchant has not been changed by statute. Daniels on Negotiable Instruments, Vol. II, pp. 621, 623, says that, though bills of lading are generally classed among negotiable instruments, and are frequently spoken of as negotiable, that it is more correct to call them ' quasi negotiable, since they are *like* rather than of them;' and on p. 623 he says : ' It will be seen that their peculiar properties (refering to transfer by indorsement) are attributable rather to a liberal application of the doctrine of equitable estoppel for the benefit of trade, than to any custom or statute which placed them upon the footing of negotiable instruments, for both of these sources of negotiability are wanting.' Such being the common law doctrine, necessarily an indorsement of a bill of lading in England, where there has been no statutory modification, does not carry with it the liability assumed by an indorser of a negotiable instrument. Therefore, the cases of Leather vs. Simpson, L. R. 11 Eq. 401, and Robinson vs. Reynolds, 42 E. C. L. 634, though parallel cases as far as the facts are concerned, do not apply to the case at issue, because by statute we have clothed bills of lading with all the attributes of negotiable instruments, something unknown to the common law. The Pennsylvania cases cited are equally inapplicable for the same reason, that we must presume the common law to be the law governing those cases, without evidence to the contrary. The case of Shaw vs. Railroad, 101 U. S. 557, is cited, as the expression of the highest tribunal on the question of the liability

3

arising out of the indorsement of a forged bill of lading. In this case, the statutes of Pennsylvania and Missouri were both regarded by the Court in order to determine the question. The statute of Pennsylvania simply says: 'Bills of lading shall be negotiable and may be transferred by indorsement and delivery;' while Missouri has enacted that 'they shall be negotiable by written indorsement thereon and delivery in *the same manner* as bills of exchange and promissory notes,' and the Court most properly says: 'No statute is to be construed as making any innovation upon the common law which it does not fairly express, nor altering the common law further than its words import.' * * * 'It cannot be, therefore, that the statute which made them (bills of lading) negotiable *in the same manner* as bills of exchange, intended making them so in all respects.' But our statute expressly says not only *in the same manner*, but also *to the same extent*, that is to say '*in all respects.*' No interpretation can be placed upon the words 'same extent,' if they do not mean, that to the same extent that bills of exchange and promissory notes are negotiable, with all the resulting effects, so also hereafter, shall be bills of lading. The rule laid down in Platt vs. R. R. Co., 99 U. S. pp. 58 and 59 is, that in putting a construction upon a statute it must be expounded so as to give effect to every part of it, and when a given construction would make a word redundant, it was reason for rejecting such construction; hence, some further interpretation must be put upon the expression '*and to the same extent,*' made use of in Section 2485, Revised Statutes, relative to the negotiability of bills of lading."

We have availed ourselves of the labors of the learned counsel who have prosecuted and defended this cause, and have quoted at length from their statements of fact (which we find in all particulars sustained by the record), and their arguments. The questions submitted are of interest from their relation to commercial conduct and as involving a construction of a statute of the State, upon which no determination has been had by our highest Court.

Bills of lading and promissory notes have well and accepted

definitions, their relations with affairs are regulated and ordained by law, and their uses and force imbedded into the commercial condition of this country and all commercial countries.

The former are representative of the property described by them. " Symbolical of the property it describes," is a quotation most apt in its expression. A promissory note is an unqualified, unconditional promise to pay a certain sum at a certain time.

A bill of lading, therefore, like the property it represents, may be transferred independent of the question of negotiability. The law merchant has, however, out of the necessities of trade and enlightened dealings between men and nations, adopted a usage in regard to such transfers, that has overcome law. Since Twyne's Case, 1 Smith L. C. 1, it was held that any transfer of property without actual delivery was a fraud ; even where good faith existed ; from the inconveniences and difficulties attending mercantile enterprises when delivery had to be actually made at the moment of transfer, transactions were virtually destroyed ; custom gave to certain evidences of contract, *e. g.*, bills of lading, that effect which is defined so accurately in the quotations from Daniels, and by counsel for plaintiff, " quasi negotiable, since they are rather *like* than *of* them." Daniels on Negotiable Instruments, Vol. II, p. 621.

Hence, bills of lading are transferrable without endorsement. 4 Comst. 497 ; 9 Barr, 475, and authorities cited ; 7 Reporter, 275, and also 31 La. An. 846, Chopin vs. Clark, as an examination of the facts will show.

Take the opinion of the Court in Holmes vs. German Society Bank, 7 Reporter, 275 : " The bill of lading was attached to the draft as a security for its payment. It was, therefore, evidence of an appropriation of the proceeds of sale of the property contained in the bill of lading, whether the bill was endorsed or not."

The law merchant is a part of the law of Louisiana, (Thompson vs. Myine, 4 La. An. 200) and as interpreted by the Courts in other States, will be adopted in this, except when modified by statute. The Act of 1868, No. 150, p. 193, was enacted after the

establishment of this principle, and we must construe it, therefore, by the light of what had been decided by the Courts.

An examination of the entire statute must convince, that the objects of the various sections were in aid of the already universally recognized rules and to throw around these peculiar engagements of commerce the sanction of the law, to punish illegal practices, and to determine the means of facilitating enterprises through a species of transaction, entering so largely into commercial pursuits as bills of lading, cotton press, warehouse and shipping receipts, and all these forms of dealing are made negotiable, (just as bills of lading), Sec. 2485, Revised Statutes, by indorsement in the " same manner and to the same extent as promissory notes." None of these, however, are promissory notes, nor have they relation to money, except as representing a claim in or to money as property, or to property which, of course has a moneyed value. In the enactment of the statute, the State performed a duty which required that safeguards should be thrown around these matters and to impose such conditions as the public interest required. It, the statute, does not profess to give a more extended importance to such documents than already obtained in the mercantile world ; nor does it make either of them a bill of exchange or a promissory note. Every bill of exchange, every promissory note, is not negotiable, and there are conditions imposed upon the instruments under consideration, by the statute, which would at once destroy those rights which result from title, in a negotiable promissory note. Bills of lading, under the statutes of this State, are, with or without endorsement, nothing but the symbol of property, and their delivery is made the evidence of appropriation or as decided in 29 Maine, 419, " by indorsement they pass title to the indorsee ;" there is no warranty expressed, nor can any be implied. It is not a sale.

In Bank of Syracuse vs. Armstrong, 7 Reporter, 657, the Supreme Court of Minnesota held, that " a promise, in the form of a promissory note, in a contract of sale of a reaper, the sale to be absolute in the payment of the note, was not an obligation entitled to the privileges of a negotiable instrument."

As decided, such an instrument had none of the requisites of a note. "It was not an independent, absolute, unconditional promise for the payment of a precise and definite sum of money in all events, and without any contingency, as is essential to the validity of commercial paper."

The same may be said of a bill of lading, and it will not be contended, because the legislature proposes to apply to it a commercial usage, and permitting to arise therefrom a character of negotiability, one of the consequences, not one of the attributes of a promissory note, that it thereby becomes a promissory note.

Would it (bill of lading) not, like the promise referred to in the case just cited, be an obligation of a "character altogether too uncertain to serve the purpose of commercial paper as the representative of money in business transactions?" It comes into the hands of every holder, with notice of the existence of a condition that may result in defeating any recovery upon it and, therefore, cannot have accorded to it the privileges attaching to that kind (negotiable) of paper."

These conditions are evident from the nature of the contract, which is but an acknowledgment by the carrier of the reception of the goods and an obligation to deliver them in safety at the port of discharge; and these conditions are expressed in the body of the instrument.

There is virtually no difference between the statute of Missouri and that of Louisiana by the insertion of the additional words, to the "same extent," in our statute. Nor can we agree that these words should be construed to mean "in all respects." To say, that by an indorsement of a bill of lading it is thereby negotiable "in all respects" as a promissory note, this Court would make an instrument entirely inconsistent with the statute and at variance with every established principle of usage and law, as applied to negotiable paper.

The reason of the statutes of Pennsylvania, Missouri and Louisiana is evident.

The transfer of the bill of lading by indorsement to indorsee, while it appropriates the property or the proceeds, does not vest

absolute title, nor does it necessarily vest more than an equitable claim to a portion of the goods, or give a pledge or lien for the payment of the advance or draft attached to which, as security, is the bill of lading. Kinne's Law Com., page 226, Vol. II, and authorities there cited ; Sec. 2482, Rev. La. Stat.

The principle established in Canard vs. Atlantic Insurance Co., 1 Peters, 445, was :

" Strictly speaking, no person but the consignee can, by any indorsement in the bill of lading, pass the legal title to the goods. But if the shipper be the owner, and the shipment be on his own account and risk, although he may not pass the title by virtue of a mere indorsement of the bill of lading, unless he be the consignee, or the goods be delivered to his order ; yet by assignment on the bill of lading, or by a separate instrument, he can pass the legal title to the same ; and it will be good against all persons except purchasers, for a valuable consideration, without notice, by indorsement on the bill itself."

It was eminently proper, therefore, to enact such laws as would give some substantial effect to the transfers of these necessary instruments of commerce and, as far as possible and consistent with their character, make them negotiable in "the same manner and to the same extent" as promissory notes are negotiable— *indorsement—delivery*—the right to sue on the contract—for example ; avoiding thereby the questions of assignment and conflicting title suggested in the opinion in Canard vs. Atlantic Ins. C<sub></sub>., just quoted, and the actual delivery of the goods themselves ; but to apply the statute of this State so that an indorsement of a bill of lading carries with it the liability attendant upon the indorsement of other negotiable instruments, would be contrary to a just and proper interpretation.

We have so far considered the general effect of the negotiability of bills of lading by indorsement. Turning to the case before us, we find that McCuiston purported to ship nineteen bales of cotton to John Phelps & Co. For these nineteen bales of cotton he received a bill of lading ; this bill of lading he attached to a draft for $750, drawn on John Phelps & Co., who were to receive

this cotton for account of McCuiston, their correspondent; this bill of lading was not indorsed by McCuiston, but was delivered to defendants with the draft, as a security for the sum advanced, and such delivery and possession was sufficient to operate as an appropriation of the property or proceeds resulting from its sale. 25 Ohio Stat. 360; 14 N. Y. 497; 44 N. Y. 136.

The draft was genuine; the bill of lading proved to be a forgery. No question of bad faith or improper practices arise. Defendants *indorse for collection* to the State National Bank of this City, the draft and the bill of lading, and on presentation plaintiffs pay and receive from the State National Bank the draft and the security or bill stamped by the State Bank "*paid*." This delivery to plaintiffs of the bill of lading, without any other form or question, at once gave them the right to demand, receive and, if necessary, in their own name, sue for these goods; a right arising at once from the payment of the draft and the possession of the bill of lading. If the statute intended to hold an endorser of a bill of lading or shipping receipt responsible, "in all respects," as it would an endorser on a promissory note or bill, it would certainly have provided in some positive manner for so great a change in the destination of mercantile instruments.

Sec. 2482, Rev. Stat., says: "* * any bill of lading, etc., * * may be transferred by indorsement thereon, and any person to whom the same may be transferred shall *be deemed and taken to be the owner of the goods, etc.* * * *So far as to give validity to any pledge, lien or transfer made or created, etc.* * * No property shall be delivered, except in surrender and cancellation of the original receipt, bill of lading, etc. * *"

Thus is described the negotiability of bills of lading, and as thus provided, they are negotiable, undoubtedly, "in the same manner and to the same extent as bills of exchange and promissory notes;" but their character, as symbols of property, remains,

The decision in Shaw vs. Railroad Co., 101 U. S., page 565, is exhaustive, and there is no reason why it should not prevail as authority in Louisiana.

It is the construction of statutes, similar to the one existing here, by the highest tribunal in the land.

Say the Court:

" They (bills of lading) are in commerce a very different thing from bills of exchange and promissory notes, answering a different purpose and performing different functions. It cannot be, therefore, that the statute which made them negotiable by indorsement and delivery, or negotiable in the same manner as bills of exchange and promissory notes are negotiable, intended to *change totally their character*, put them, in all respects, on the footing of instruments which are the representatives of money, and charge the negotiation of them with all the consequences which usually follow the negotiation of bills and notes. *Some of these consequences would be very strange, if not impossible.* SUCH AS THE LIABILITY OF INDORSERS, ETC."

This view is conclusive of this case and its citation as authority sufficient, but justice to the counsel and the questions urged by them required the examination given.

Judgment reversed and judgment in favor of defendants with costs in both courts.

### CONCURRING OPINION.

McGLOIN, J.—The facts of this case are fully stated by my learned colleague, and while I agree with him in the legal propositions he has announced, there are others which have had an influence upon my mind, and which I deem it proper to state briefly.

The Section 2484, Revised Statutes of Louisiana, makes bills of lading " negotiable by endorsement in blank, or special endorsement in the same manner and to the same extent as bills of exchange and promissory notes." Even conceding that the inscriptions set up in this case constitute an endorsement, as the same is known in law, it does not follow, from this provision, that the defendant is liable as contended for by plaintiff. The commercial law, or mercantile usage, which makes paper of a particular kind *negotiable*, and those which do more than simply

conclude the question of title, as by excluding equities, such as the one in question, or making an endorser a guarantor of previous signatures, or those requiring protest, notice, etc., are not one and the same thing. It, therefore, does not result, that, because for certain purposes, the legislature has extended the first mentioned of these rules, to cover bills of lading, that the others all accompany it. These laws are all exceptional, and are not to be extended by implication.

Furthermore, if the law holding an endorser as guarantor of previous signatures, is applicable in this case, equally so are all the rules of the commercial law governing bills of exchange and promissory notes. Hence, as strictly commercial paper must receive timely presentation and due protest in event of non-acceptance or payment, with immediate notice of protest to the endorser; all in order to hold such endorser; it follows, that to fix the liability of an endorser upon a bill of lading, there should be due demand with protest and notice, in case of non-delivery of the property covered. In this instance, the bill of lading was repudiated by the railroad company, and there was neither protest nor notice of protest, and none is alleged. Hence, plaintiffs evidently could have no remaining cause of action upon the endorsement as such.

When a party who has endorsed papers is released from his obligation, for failure to protest or notify, the release is complete. The effect is the same as though the signature had been stricken from the paper. Now, the guarantee of the genuineness of a bill forms a portion of the obligation of the endorser, as such; and when his contract is discharged by the laches of the holder of the bill, or otherwise, it perishes as to him *in toto*, and liability of every character is gone. It is difficult to comprehend upon what principle the responsibility of an endorsee should, in one respect, survive the discharge, while in all others it expires. The law, holding endorsers to a broad liability, compensates them for its exactions by throwing around their interests the most jealous safeguards. The fate of the bill must be determined without

delay; and if it go wrong, due protest must be entered, and immediate notice be given to the endorser. The object of these requirements is to afford the latter early knowledge of the dishonor, in order that he may protect himself, if possible. Whether the note or bill be rejected for lack of funds, or for fraud or forgery in its execution, protest is essential; and early notice is as necessary to the endorser in one case as in the other. It would be poor comfort to him who had been carelessly suffered to remain in ignorance, while the forger escaped in person and property, to say that he was released only as an actual party to the bill, but still held as guarantor of the verity of the forged paper.

The plaintiffs have evidently foreseen these difficulties and endeavored to elude them; for the petition is most carefully framed, and charges the defendant, not strictly as an endorser, but for the reimbursement of money paid in error. The allegations are that McCuiston was without general power to draw the draft in this case, having been paid solely upon the credit of the bill of lading, which was covered by defendant's guarantee; and said bill of lading, being a forgery, was paid in error, and that the amount so paid should be refunded by defendant, by reason of said guarantee. The positions plaintiffs thus attempt to assume are incongruous. If defendant is responsible as guarantor, its liability is to *make good the bill of lading;* and when plaintiffs seek to enforce such liability, the process has for its practical purpose the validating of that contract, and the upholding of the draft and of the payment made thereunder. The demand, however, for the reimbursement of the sum paid upon the draft, (and hence, constituting, as it were, the price by plaintiff given for the bill of lading) is an impeachment of the draft and its payment, and a repudiation of the bill of lading. This difficulty arises from the attempt to hold defendant, in any manner, *upon the draft itself.* If the agreement evidenced by this particular paper is to be annulled, directly or indirectly, there is a matter presented that does not concern the defendant, but McCuiston. The drawing of the draft was a proposition or request from the drawee to plaintiffs, for the payment of a certain sum for account of the

latter. The payment by Phelps & Co. was their acceptance of this proposal, made upon the representation of McCuiston that he had shipped cotton to cover, and completed the contract. If this agreement was null for fraud, forgery or misrepresentation, on the part of McCuiston, the demand for nullity and reclamation should not be directed against the payee, but against the dishonest drawer, with whom alone complainant had contracted. As to the holder of the paper, payment, which is the most emphatic of acceptances, admitted the genuineness of the bill, and operated as an estoppel.

It is evident, therefore, that plaintiffs' only recourse against defendant, if any existed, was upon the bill of lading, either to hold it (defendant) upon the endorsement, if any such there were ; or, perchance, for damages.

Not having sued upon the said contract of shipment, Phelps & Co. should not recover ; for, upon the draft in any shape, there is no cause of action against the Farmers' and Merchants' Bank

Another difficulty presents itself in plaintiffs' path. If they can set up against defendant the guarantee of the bill of lading, there is opposed to this the guarantee and consequent estoppel, chargeable upon Phelps & Co., resulting from the payment of the draft, and covering the right of McCuiston to draw. The Bank was not held to know that the drawee honored the draft solely upon the credit of the shipment of cotton, and plaintiffs did not so inform them at the time of payment. In fact the shipper, in delivering the bill of lading, by writing thereon, required the Farmers' and Merchants' Bank to notify plaintiffs ; and, as said McCuiston would have to have had some representative in this City to handle the cotton for him, had it been really shipped, the said Bank had a right to consider Phelps & Co. as simply such agent of McCuiston, and it was not bound to know or ascertain the rights of that firm or the nature of the contract it had made with its principal. The annexing of the bill of lading was demanded by the Farmers' and Merchants' Bank to secure itself upon its own advance ; but it was not compelled to suppose that McCuiston was without funds or other credit in the hands of the

drawee. Under such circumstances the estoppel or guarantee against plaintiffs may well be considered the stronger; or, if they be of equal strength, then " *in pari passu, potior est conditio possedentis (vel defendentis)*."

Finally, an examination of what is set up as an endorsement of the bill of lading, is no endorsement at all. The forged document purports to evidence a shipment of cotton to " order Farmers' and Merchants' Bank, notify John Phelps & Co., New Orleans." The consignee, thus constituted, placed upon the reverse of the paper the following inscription: " Pay to the State Nat'l Bank N. O., or order, *for collection*, on acc't of Farmers' and Merchants' Bank, Paris, Texas, C. W. Hertz, Cashier." This was not an absolute endorsement of the document, but a mere power of attorney to the State National Bank, or such as it might put in its place for that purpose, to collect or realize upon the bill. It was not intended to, and did not in fact, transfer title to the last named Bank or its order; and the latter, though in possession, had no standing as endorsee. Neither did it authorize the said Bank to place the name of its principal, by endorsement, upon the paper, or to transfer the title to any one, *as endorsee*. It authorized the agent to claim the cotton, at the port of destination, for account of its principal, or to surrender the bill of lading to the shipper, his agent or assignee, upon the discharge of the claim secured by the shipment. Let us suppose the collateral to have been a mortgage note, instead of the document in question in this case, which mortgage note was endorsed either in blank, or to the pledgee, at the time of the loan or advance. Let us suppose, further, that at the maturity of the principal obligation, the creditor sends it, with the accompanying collateral, to another city for collection, inscribing the said mortgage note to an agent in the same manner as has been done with the bill of lading in this case. The debtor, his agent or assign, in satisfying the principal debt, would be entitled to the collateral; but, would it be contended that the representative of the creditor, in making the surrender, could bind his principal as an endorsee upon the paper delivered up? Certainly not.

The State National Bank, however, in this instance, made no attempt to so bind its principal, the Farmers' and Merchants' Bank, when the draft was paid; it simply stamped draft and bill of lading, as follows: " State National Bank, New Orleans. Paid." This inscription was not in fact or intendment an endorsement, and the transaction was no more than a delivery of said forged paper to the party named therein, as one to be notified by the holder; such delivery being made when the claims of the holder were satisfied by the person thus indicated by the pretended shipper.

Surely there is no lack of reasons for reversing the judgment appealed from, and for rejecting plaintiffs' demand.