## No. 248.

### THOMAS H. ALLEN & Co. *v.* JOHN S. HORNOR & SON ET ALS.

1. Where, on receipt of a telegram announcing shipment of cotton and asking if a draft will be honored, the party addressed answers that he will pay the draft against the cotton shipped, held, this is an authorization to draw, coupled with a condition.
2. Where, in such a case, the draft is drawn, and is discounted by a party, at whose instance, before discounting, this exchange of telegrams was had, and a bill of lading supposed to represent the cotton in question is attached, and it transpires that the bill of lading is fraudulent, having been raised or altered from a bill of lading covering merely a box of cotton seed—held, the draft is, in fact, one drawn not against cotton, and not within the limit of the original authorization.
3. Where, said fraudulent bill of lading being attached, and upon the faith thereof, the drawee, in ignorance of the fraud, pays such draft, it is a case of payment through error, and the amount thereof may be recovered back from the original drawee.
4. In such a case, neither the draft nor the bill of lading need be surrendered, or tendered to the defendant, before institution of the suit.
5. Nor need plaintiff, in such a case, establish a tender of the box of cotton seed, actually shipped.

*Appeal from Civil District Court, Division B. Houston, J.*

*Percy Roberts* for plaintiffs, appellees.

*T. J. Semmes & Payne* for defendants, appellants.

ROGERS. J.—On the 11th day of December, 1882, a man representing himself as W. B. Reeves, of W. B. Reeves & Bro., entered the banking house of defendants, Hornor & Son, in Helena Ark., and asked the senior member of the house if the bank would discount a draft drawn by him (Reeves) on the house of Thos. H. Allen & Co., of New Orleans, offering a bill of lading for twenty-one bales of cotton as collateral security. The firm of Hornor & Son declined to discount his draft, not knowing Reeves, unless he first obtained authority from said Thos. H. Allen & Co. to do so. Reeves volunteered to obtain authority from either the house of Thos. H. Allen & Co., in Memphis, or the one in New Orleans. He left the bank, and in about the time necessary to send and receive a telegram from New Orleans, returned with the following :

" Will pay draft of $700 against twenty-one bales.

(Signed)          THOS. H. ALLEN & Co."

This being an answer to Reeves' telegram, which read :
" Thos. H. Allen & Co. :

" Have shipped you twenty-one bales of cotton per steamer Chouteau. Will you honor our draft for $700?

(Signed)          W. R. REEVES & BRO."

Hornor & Son, recognizing the bill of lading to be properly signed—as they held at that time other bills of lading signed on that trip by the clerk of the Chouteau, the clerk using a fac-simile stamp—and considering Reeves as a correspondent of Thos. H. Allen & Co., with limited authority to draw upon them, took the bill of lading and telegram, discounted the draft in good faith, and forwarded all together to Burbridge & Co., by whom said draft was presented to Thos. H. Allen & Co., and by them paid without hesitation or comment. Some days afterwards, upon the arrival of the Chouteau, it was for the first time discovered that the bill of lading had been altered, the only thing shipped being a box of cotton seed consigned to Thos. H. Allen & Co.

Demand was then made by Allen & Co. upon Burbridge & Co. for the money paid when the draft was taken up, and said demand was refused; there was no tender by Thos. H. Allen & Co. of the draft, bill of lading, or box of cotton seed at the time said money was demanded, or at any time since.

Plaintiffs bring suit against Hornor & Son and J. W. Burbridge & Co., who endorsed the draft and collected it from plaintiffs.

The facts disclose, that Reeves & Co. were unknown to either party—that this was the first transaction of any character ever had with them. It is evident that the dispatch of Allen & Co. was induced by no faith whatever in Reeves, but by the shipment to them of twenty-one bales of cotton.

Their agreement, therefore, was not properly an acceptance of the draft of Reeves; it was a promise to pay a draft against twenty-one bales of cotton shipped by steamer Chouteau, or an authority to Reeves to draw on them on the condition that twenty-one bales of cotton were shipped to them by said steamer. None of the essential elements of negotiability attached to a draft or bill of exchange could be implied, that would bind an acceptor under the rules of commercial law—nothing to indicate that faith in the drawer, which excludes all theory of a claim for indemnity against or recourse to the holder of the instrument. Strictly speaking, therefore, conditional drafts, or conditional acceptances, are not commercial paper, their payment is due upon condition, and not in any event; the general rule of commercial law is not therefore applicable; the very condition they express disposes of the privileges granted in favor of commerce to negotiable instruments, which closes the avenues of defence open to all other and ordinary transactions.

The defendants are not third persons, they are primarily the real parties. They received from Reeves the bill of lading, the representative of the twenty-one bales of cotton, knowing full well that the condition upon which plaintiffs would pay the draft discounted by them, was the shipment of the cotton, and besides inserting in the body of the draft a reference to the

bill of lading and telegrams, attached them to the draft, as evidence that they had seen to the performance of the condition stipulated by the plaintiffs. It will not do, therefore, to say that this holder of the draft is absolved from all responsibility from acts of negligence and indifference, and that responsibility and liability shift to the shoulders of the one who has agreed to pay. It is not a question of equal negligence or a division of responsibility—for one might have refused the discount, it is true—or that the other might have refused payment, is equally true—but a consideration of condition precedent having been assumed and the belief of its performance having been impressed and regarded, does not alter the fact that the condition was not performed and the money paid in error.

We have fully discussed and determined our view of the law governing bills of lading in the case of John Phelps & Co. vs. Mechanics' & Farmers' Bank, 2 McGloin, 11, and in adhering to those views, do not consider it necessary to determine the proposition, that the delivery of the bill of lading to plaintiffs was a fulfilment of the condition imposed by their dispatch.

The law as held by us in Agnel vs. Ellis, 1 McGloin, 61, is applicable to this case, and we must be governed by the laws of Louisiana.

The present action is not brought to rescind a contract under Arts. 2045, 2047 C. C. It is based on Arts. 1893, 2302 C. C.

The position of the plaintiffs is, that we paid to you seven hundred dollars on the delivery to us of twenty-one bales of cotton; that you transferred to us what purported to represent said property—a bill of lading; in fact, you transferred to us nothing—neither the cotton specified, nor a bill of lading. The inducement for the payment to you was the supposition that you transferred the property; that was the cause and motive for our payment. You must return to us the money paid you in error.

The plea urged by defendants, that this action must be dismissed because no tender was made of the box of cotton seed, or the draft or the bill of lading, is made on erroneous views of the conditions of this controversy. As to the box of

cotton seed, there is no evidence that it was ever received at this port—certainly nothing to indicate that plaintiffs received it. Defendants certainly placed it beyond the power of plaintiffs to obtain it, as the bill of lading delivered purported to be for entirely different articles, and was a worthless piece of paper as it purported to represent property.    The draft was plaintiffs' voucher for the payment to defendants, and there was no reason to return it, no right in defendants to claim it.    The bill of lading, as already stated, was a mere worthless paper and evi‐denced nothing but the crime admitted to have been perpetrated and was attached to the draft with the telegram as a part, and setting forth its consideration.    The necessity of putting in default, under Arts. 1912, 1913 and 1914 C. C., arises from the principle based upon the benefit derived by the one who has received and the consequent loss or disadvantage to the other who has made the delivery or parted with the thing.    That ben‐efit may be insignificant, the loss or disadvantage equally so, but no matter the extent, the equitable rule that parties should be placed in the same position they were at the time of the con‐tract, exacts this pre-requisite    On this principle, a person can‐not keep the property and claim the price.    In a case, however, where the obligation assumed was without a cause, C. C. 1896, or that a cause never existed, the principle is entirely different. We find promissory notes and bills of exchange excepted from the rule laid down in Art. 1914 C. C.    The obligation, under the rules laid down in the several Articles of the Code, 1893-1896 was without the cause necessary for its validity, it was without effect. The civilians use the term *cause* in relation to obligations, in the same sense as the word consideration is used in the jurispru‐dence of England and the United States.    It means the motive, the inducement to the agreement.    Articles 1912, 1913, 1914 C. C. refer to contracts of mutual interest, when the cause of the engagement is the *thing given, or done, or engaged to be given or done, or the risk incurred* by one of the parties; but when an en‐gagement has no cause or consideration, or, what is the same thing, when the cause for which it is contracted is *false,* the

engagement is *null.* and the contract based on it is also *null* and cannot be enforced by an action. Money paid under such an agreement can be recovered back by the action *condictio sine causa.* Mouton vs. Noble, 1 La. An. 193; C. N. Art. 1376; 11 La. An. 654.

The necessity for default implies, on the part of him who seeks a recovery, a neglect of some duty imposed by law, the performance of some condition precedent, which he should first perform or offer to perform before requiring performance from the defendant. In the present case the plaintiffs occupied the position of holding the condition precedent in their favor. They could not have been required to pay the draft before the delivery to them of the 21 bales of cotton or its representative, the bill of lading. Before defendants could have recovered on the draft, they would have been compelled to tender the property, but the fact that the plaintiffs paid the draft on the inducement or motive that defendants had complied with their agreement, did not require plaintiffs to place defendants in default for a failure to deliver, the cause never existed, there was in law and fact no inducement, and the obligation that existed before the payment of the draft, still existed with defendants as a condition precedent to deliver the property. The plaintiffs having received nothing, secured no benefits of which defendants were deprived; they, plaintiffs, had nothing to restore, the only ones benefitted by the transaction, speaking now of the draft and its payment, were defendants·

There is no dispute that timely and proper notice was given defendants of the forgery and failure of the cause of the contract; there are no averments, no proof that the acts of plaintiffs, in this regard, have occasioned loss to defendants.

Similar questions have frequently arisen in our courts, where parties have brought suit to recover back money paid in error, *e. g.*, by an acceptor of a bill, who had paid in error to a holder' who had no right to receive payment. Dick vs. Leverich, 11, La. 576.

By an endorser against the holder, who had failed to have note

protested, so that recovery against a previous endorser was lost. Oakey vs Bank, 17 La. 386; Heath vs. Bank, 7 Rob. 334.

Where a payment was made on an account rendered and a receipt given, when the account was false. Massios vs. Gasquet, 4 Rob. 137.

In affirmance of the same principle and on analogous facts; 11 Rob. 102; 2 La. 129; 5 La. An. 15; 14 La. An. 499; 16 La. An. 217; 19 La. An. 328; 15 La. An. 268, 353.

The question of putting *in mora* was not raised, nor is there any intimation in any of the decisions of the propriety or necessity for the plea. Surely from such a chain of decisions the conclusion is irresistible that the principle invoked under the facts of the present case can have no application.

Judgment affirmed.

### CONCURRING OPINION.

McGLOIN, J.—After being for a time of opinion that the judgment appealed from in this cause should be reversed, and after having even conveyed to my colleague my dissent from the conclusions reached by him, I have, after further consideration finally been convinced that there is no error in the judgment which has been brought up.

It is conceded, in this case, that J. W. Burbridge & Co. were merely acting for John S. Hornor & Son, for the purpose of collecting this draft; hence, the parties really to the transaction and litigation are only John S. Hornor & Son and plaintiffs, Thos. H. Allen & Co. Neither of these are innocent third persons, in the sense of the commercial law, and hence, the question of *negotiability vel non* of the draft in question, is not one necessary to the case, and I abstain from declaring that the said draft was not commercial in its character.

Between John S. Hornor & Son and Thos. H. Allen, there is nothing which can arise so as to bar out matters of defence or exception. I consider that the telegram of Thos. H. Allen & Co. to Reeves, constituted the warrant or authority to said Reeves to draw the draft in question. It may be likened in a way to a

power of attorney to that effect. It was, however, conditional, taking validity, therefore, only upon the execution of the condition. John S. Hornor & Son were well aware of the facts, knowing that the authority to Reeves was not an unconditional one, and they should not be allowed to alter its tenor, so as to emancipate the draft, drawn in obedience to it, from the influence or control, as to them, of the condition. It was their duty to see, before taking the draft, that the condition in question had been fulfilled, and if, for any reason whatever, it was difficult or inconvenient for them to do this, and they accordingly omitted it, or if they were deceived in any way, the risk was their own and not that of Thos. H. Allen & Co. As a man binds himself, so let him be bound. Thos. H. Allen & Co. bound themselves to pay a draft drawn against twenty-one bales of cotton, and to refuse them relief in this case, is to compel them to pay against their express convention, a draft drawn against a box of cotton seed.

Nor do I consider that, in a case such as this, upon general principles, Thos. H. Allen & Co., had they received, at the time of taking up the draft, anything of real value, would have been excused from the duty of restoring what was thus received, and even of tendering it as a condition precedent to instituting their suit. The evidence, however, does not show that Thos. H. Allen & Co. received the box of cotton seed. Under ordinary circumstances, a bill of lading represents the property constituting the shipment, and possession of the bill of lading constitutes a legal possession, perhaps, of the property in question. But these principles can have no application in presence of a piece of paper which has lost, by means of a fraudulent alteration, its character as a bill of lading, having been altered so as to purport to cover twenty-one bales of cotton, it could serve no longer as evidence of a contract for the delivery of one box of cotton seed. The carrier would, no doubt, ignore it entirely as a document rendered null and void by alteration of its tenor, and there arises; therefore, no presumption against plaintiffs, that, because they held this paper, they did receive, or could have received, the box of cotton seed in question. I consider this so-called bill of

lading as a piece of worthless paper. And the draft; being by an absconded drawer, drawn fraudulently and against instructions and contract, and having thereon no endorsements that could be valuable to John S. Hornor & Son, that I consider also, as a document, worth absolutely nothing

To maintain that Thos. H. Allen & Co. had to make a tender of these two instruments, before instituting this suit, would be to compel them to tender what had no appreciable value, and hence, to do what practically would be a vain thing.

We have a maxim *"de minimis non curat lex,"* and if courts would concern themselves to defeat just rights, simply upon matters involving practically no more than two scraps of useless paper, they would be violating the spirit, if not the letter, of this maxim, and be compelling the law to recognize and deal with what was trifling indeed.

It may be proper to state, in closing, that the difficulty which prevented me, originally, from agreeing with my learned colleague in the conclusion he had arrived at, related solely to this question of tender, and that upon the other questions involved, I saw no difficulty, considering the case, as to them, clearly with the plaintiffs.